```
 20   275
 88   802
 ─────────
 20   275
e125  729
```

:No. 52.—ALEXANDER J. ROBINSON, plaintiff in error, *vs.* ERASMUS BEALLE, surviving partner of the firm of F. & E. Bealle, defendant.

[1.] In a suit against one as a stockholder in the Planters' & Mechanics' Bank of Columbus, a transfer of stock by him on the transfer book of the bank, is evidence against him that he once owned stock to the amount of the stock so transferred.

[2.] In the Planters' & Mechanics' Bank of Columbus, the directors are liable to the stockholders for bills redeemed by the stockholders, if they be bills issued in " excess" of the quantity of bills which the charter authorizes to be issued. And if the holder of such bills release the directors he, in effect, releases the stockholders. (But see the opinion.)

[3.] The liability of the directors of the same bank to pay debts created in " excess," is a joint one.

[4.] On a question, whether a bank's cashier had the power to issue a specie certificate, when there was no specie deposited, an interrogatory to a witness, asking whether the cashier had the power or not, was proper.

[5.] Inferior evidence ought not to be received, if superior be attainable.

[6.] On the question, whether a cashier of a bank has authority to issue a certificate of deposit, other acts of a similar kind, frequently done by him, are admissible as evidence.

[7.] If the holder of the bills of the Planters' & Mechanics' Bank of Columbus settles with a stockholder and discharges him, the amount he receives is not material to the ascertainment of the proportionate liability of another stockholder.

[8.] Although the act of the cashier of a bank, in making with the stockholders of another, but unorganized bank, an arrangement to enable them to organize their bank in evasion of an important provision of their charter, is an illegal act; still, if it be an act done by the cashier, not for himself or for his benefit, but for his bank and its benefit, and an act beneficial to his bank, and one that was known to its directors; or which, if not known to them, had, for the cause of its being not known, that they neglected to bestow ordinary attention on the duties of their office, and which act, yet, those directors did not repudiate or expose to the public, or in any way neutralize, it is an act of the bank; and being an act of the bank, one of the consequences of the act is, to debar the bank from resorting to the stockholders of the other bank for payment of the bills which it holds on that bank.

Debt, in Muscogee Superior Court.   Tried before Judge WORRILL, May Term, 1856.

This was an action brought by defendant in error against Alexander J. Robinson.

The declaration alleges that Robinson was a stockholder in the "Planters' & Mechanics' Bank of Columbus," to the amount of 575 shares of stock, rated at $100 per share. The charter of the bank provided, "that the persons and property of the stockholders shall be pledged and held bound in proportion to the amount of shares, and the value thereof, that each individual or company may hold in said bank for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt, and no stockholder shall be relieved from such liability, by sale of his stock, until he shall have caused to have been given sixty day's notice in some public gazette of this State." The plaintiff alleged that he was the holder of bills of the bank to the amount of $500, on which he had obtained judgment

against Robert B. Alexander, assignee, appointed by the Legislature to take charge of and wind up the affairs of said bank; on which judgment execution had been issued and a return of *nulla bona* made thereon by the Sheriff. Plaintiff sought, in this action, to make the defendant, as a stockholder in said bank, liable for the payment of said bills.

The defendant filed a number of pleas; among them the Statute of Limitations, the forfeiture of the charter of the bank, and the release by plaintiff of the directors of the bank.

A great deal of evidence was introduced on both sides.

Plaintiff, in making out his case, introduced in evidence (defendant objecting thereto) the transfer stock book of the Planters' & Mechanics' Bank, to prove ownership of stock in defendant. The Court over-ruled defendant's objection to this testimony, and defendant excepted.

The transfer book showed that A. B. Ragan, cashier, transferred, in 1838, one hundred shares of stock to defendant, and that H. S. Smith and Wm. A. Redd transferred to defendant, in October, 1839, four hundred and seventy-five shares of stock; also, that defendant, in 1841, transferred to the bank four hundred and seventy-five shares of the capital or joint stock.

All the above transfers, except the one first mentioned, were witnessed by Matthew Robertson on the transfer book.

Plaintiff proved by Matthew Robertson, that the transfers which appeared on the transfer book by and to defendant, were made by the persons and at the times they purport to have been made. The same witness also stated that a large portion of the bills left in circulation when the bank closed its doors, had been received and paid out by the Bank of Columbus. That bank received them and paid them out freely till about the first of the year 1842, when the cashier of the bank informed witness that they had been rejected, or would be rejected, at their counter, unless he could have some guarantee for their redemption. It was then proposed by some one that several directors and stockholders should ex-

ecute a bond to redeem them from that bank, and a bond was drawn and signed by witness, John Banks and others—John Banks stipulating, at the time he signed, that he would not be bound unless all those whose names appeared in the body of the bond would sign also. Some of them refused to sign, but the bond went into the possession of the bank, who received the bills of the Planters' & Mechanics' Bank upon that security.

The defendant, among other testimony introduced, read the evidence of A. B. Ragan, who was one of the first directors of the Planters' and Mechanics' Bank, and who acted, for a while, as cashier, proving by him that a portion of the stockholders met in 1837 to organize the bank; a few of them paid in specie, some in bills of the State Bank, and others in indorsed notes. An arrangement was made, through a committee, with the cashier of the Bank of Columbus, that said cashier would give them a specie certificate for the purpose of organizing. Sometime subsequent to May, 1837, the president and several of the directors—witness among them—went to the cashier of the Bank of Columbus and asked for the specie; he showed them certain kegs and boxes, which he stated contained $230.000 in specie, and stated that he procured a specie certificate from the Insurance Bank for the balance, to make up the sum of $250.000. The kegs and boxes were not examined to see whether they contained specie, but the statement of the cashier to that effect was relied on. His statement was, without inquiry, also relied on with reference to the Insurance Bank certificate. The directors held a meeting and determined to do no business, but passed an order to loan out the money to the stockholders, if they wanted it. The stockholders, generally, borrowed it, receiving checks on the bank of Columbus. Witness never heard of any demanding specie, except one person, and the bank refused to pay him specie. In February, 1838, the annual election for directors took place, and an order was passed that the stockholders who had borrowed of the bank, should reduce their debt by paying in one half. Those who

Robinson *vs.* Bealle.

complied did so by paying in, mostly, the bills of suspended banks. Not more than $800 or $1000 dollars of specie was paid in. The new stockholders put in their notes in place of those from whom they purchased. The directors then ordered $250.000 of bills to be issued, the larger portion of which were put in circulation—witness could not tell how much.

Defendant proved by Matthew Robertson, that he was cashier of the Planters' & Mechanics' Bank; that defendant was not present when the transfers of stock were made to him, and that he complained to Gen. McDougald on his return home, that so much stock had been transferred to him without his authority. Defendant was under the impression that it had been done because McDougald owned a good deal of stock, and did not wish any more to appear in his name.

Defendant read to the Jury bills amounting to $1530, to show that he had redeemed his *pro rata* share of the circulation.

Defendant introduced S. R. Bonner, who testified, that he was one of the first directors of the bank, and made, substantially, the same statements, with reference to arrangements made for, and obtaining specie, as testified to by A. B. Ragan. He further stated, that he believed at the time, the transaction was a fair one, and made a return, under oath, to the Governor, according to the charter; but afterwards, he became satisfied that the whole arrangement was got up for the committee to swear by, in making their report.

Defendant introduced John Banks, who stated, among other things, that he refused to unite with the directors in making the return to the Governor, under oath, because he was not satisfied that the specie was at the control of the bank. The witness went on to give various reasons why he was not satisfied of that fact.

The return of the directors to the Governor was then read to the Jury.

Hines Holt testified, that $104.000 of the bills of the Planters' & Mechanics' Bank were delivered to the firm of

Holt & Alexander by the Columbus Bank, to be sued. They were afterwards turned over to Edward Carey, assignee of the Bank of Columbus.

Defendant exhibited to the Court the stock transfer book, and offered to show that A. B. Ragan and others who, it appeared from said book, had made transfers of stock to defendant, had each of them, previous to said transfers, already transferred to other persons more stock than would appear from said transfer book, as belonging to them; and for this reason, and because it appeared, from said transfer book, that there was higher evidence of the ownership of stock than said transfer book defendant moved that said transfer book, and the certificates read therefrom by plaintiff, be excluded from the consideration of the Jury.

The Court over-ruled the motion, and defendant excepted.

It was admitted that $117.800 of the circulation of the Planters' & Mechanics' Bank was claimed by the Bank of Columbus; also, $1500 of said circulation was in the hands of S. R. Bonner; that $4000 was in the hands of the executors of S. A. Bailey; and $20.500 in the hands of Mustian; which last named amounts should be excluded from the calculation.

Defendant introduced WILLIAM A. REDD, who testified, in substance, that there was an agreement between plaintiff's Attorney, William Dougherty, and H. S. Smith, to this effect: that Dougherty, in consideration of a loan or advance by Smith of $10.000, agreed to dismiss all the suits he represented against Smith, and hold Smith harmless for all his liability above $10.000. Witness took the transfer book, and with Dougherty, looked it through, and reduced Smith's liability to $17.000 or $18.000, and Dougherty offered to deduct one-third. $10.000 was agreed upon in lieu of Dougherty's proposition; and if Smith's liability could be reduced below $10.000, Dougherty was to refund the difference between the amount to which it was reduced, and the $10.000. If stockholders, similarly situated, should not be held liable, Smith's money was to be paid back by Dougherty. In any event,.

Smith was to pay no more than $10.000, on account of his stock, or as director. Dougherty gave a mortgage on land, as security for faithful performance, which was all the security given. Dougherty sued Smith, as director, once after the compromise; witness heard Dougherty say he had compromised with Banks, Chambers and Flewellen, by striking off one third of liability; Smith's liability was estimated by Dougherty and witness, by not counting stock which had been transferred to solvent stockholders; but where stock had been transferred to insolvent holders, such stock was counted in Smith's liability; Dougherty released Smith, as to stock for which other solvent men were responsible, as for instance, Dr. Robinson's; when Dougherty, after the compromise, sued Smith as director, witness had a discussion with Dougherty about the matter—Dougherty contending that he had only released Smith as stockholder—not as director; witness thought differently; William H. Mitchell heard the statements about the agreement, of both witness and Dougherty, and thought there was no difference as to facts, but only as to conclusions; Smith also disagreed with Dougherty about the agreement, when Dougherty proposed to refund the $10.000 and let matters stand as they were before; witness and Mitchell interceded, and Smith asked time to consider, and afterwards said let the matter stand as it was; Dougherty then drew up an agreement, but witness does not know whether Smith signed it or not, before he left for Mobile. In the settlement, Smith was released for all the stock transferred to Robinson, because Robinson was solvent; there never was a new contract between Dougherty and Smith after the first settlement; they never did agree about the facts; suits were dismissed after Smith returned from Mobile; there never was a new contract until Mr Moses drew one—of which witness knows nothing.

Defendant, in connection with proof to show that the bills held by the Bank of Columbus constituted bills issued in excess of 3 to 1 of the capital paid in specie, offered to intro-

duce a paper signed by Edward Carey, assignee of said bank, acknowledging the receipt of $2.000 in full payment and discharge of James M. Chamber's liability, either as director or stockholder, on account of bills of the Planters' & Mechanics' Bank, held by the Bank of Columbus or its assignee, dated February 6th, 1847—defendant contending that the issue being excessive, the directors were answerable over to the stockholders, and proof of a release of a director by the Bank of Columbus excluded the bills claimed by said bank from being counted in the circulation to be redeemed by the stockholders. This evidence was objected to by plaintiff and repelled by the Court, and defendant excepted.

JOHN BANKS was recalled, and produced a receipt signed by William Dougherty, acknowledging full payment of his *pro rata* part of a number of judgments for which said Banks was liable, under the eleventh section of the charter of the bank, as the owner and holder of certain stock. Defendant asked witness what amount of bills he had on hand after the bank made its assignment, and after judgment of forfeiture of its charter; and whether he had not paid said bills out for a plantation in Stewart County? Plaintiff objected to the question, and the objection was sustained by the Court—defendant excepting. Defendant offered in evidence 59 suits brought by William Dougherty, as Attorney for various persons at the time the settlement was made with Smith—suits being against third persons, and not against Smith or Banks. Plaintiff objected to their introduction; the Court sustained the objection, and defendant excepted.

Defendant introduced a number of suits against Smith, brought by Wm. Dougherty, Attorney, and dismissed under the agreement with Smith, at December Term, 1854, Muscogee Superior Court.

Defendant then read to the Jury the judgment of forfeiture of the Planter's & Mechanic's Bank, rendered by the Superior Court of Muscogee, in June, 1843; also so much of the transfer book as showed a transfer from John Banks to A. B. Ragan of 200 shares of stock; and a transfer from H.

Robinson *vs.* Bealle.

:S. Smith to sundry persons (prior to his transfer to Wm. A. Redd) for 326 shares; and transfers from various persons to Smith up to the date of said transfer to Redd, showing the whole number of shares transferred to Smith up to the date of the transfer to Redd to be 2802 shares.

Defendant introduced a receipt, signed by Dougherty as Attorney, showing a conditional settlement with the representatives of the estate of Geo. Smith, deceased, of his liability as the owner of stock.

JOHN FONTAINE, among other things, testified that he was a director of the Columbus Bank; knew of no arrangement with said bank to allow the stockholders of the Planter's & Mechanic's Bank to have specie in 1837; was about the Columbus Bank every day, and thinks if any such arrangement had been made, witness would have known it. Cashier had authority to give certificates of deposit. Plaintiff's Counsel then asked witness if the cashier had authority to give specie certificates unless the specie was deposited? Defendant objected to the question and was over-ruled by the Court. The witness answered the question in the negative. Witness further stated, that he never heard of Bank of Columbus being cognizant of the arrangement referred to.

Plaintiff introduced in rebuttal A. H. COOPER, and handed him a written paper, signed by said Cooper, A. B. Ragan, Wiley Williams and Adam G. Foster, and asked Cooper whether that paper contained a true copy of the bills set forth in the declaration of the Columbus Bank against the Planter's and Mechanic's Bank—plaintiff stating that his object was to identify a portion of the bills in the hands of the assignee, with the bills set forth in certain counts of the declaration referred to. Defendant then offered to show that said assignee, in whose possession the original bills were, resided in Muscogee County, and urged that the original bills should be introduced or their absence accounted for, in order that the Jury, by a comparison of the bills with the declaration, might determine for themselves the question of identity. The Court allowed Cooper's testimony to be received and defend-

ant excepted.    The witness then stated that he and the other persons named had compared the bills with the declaration and found them to correspond.

WILEY WILLIAMS proved the same facts, defendant excepting to the evidence.

Plaintiff then introduced two packages, and showed that in one of them claimed by the indorsement thereon to contain $54.000, there was deficient an amount of $44.210, corresponding with the amount in the hands of the assignee, and which amount, if in the package, would make up the amount of $54.000.

Plaintiff introduced other evidence which it is not necessary to state.

Defendant introduced the minutes of the Columbus Bank, and showed that A. B. Davis was elected Cashier in August, 1829, and that discretionary power was conferred on him to make such arrangements as he might consider beneficial to the bank, when any emergency might arise and the board was not in session; also conferring on him, together with H. S. Smith and Daniel McDougald, power to discount bills of exchange, &c.

STERLING F. GRIMES being introduced by defendant, stated that he had done a good deal of business with the Columbus Bank; that it was the custom of the bank in transactions with witness for A. D. Davis, without consultation with the board of directors, to authorize witness to check for cotton purchases; and when witness had checked for his purchases he would go to Mr. Davis and give him bills of exchange; and if witness was short $8 or $10.000 he would make a local note, satisfactory to Mr. Davis, which would be immediately credited to witness' account, without consultation with any one.    Plaintiff's Counsel asked Grimes if he could say that such was the general custom of the bank or whether he spoke only of his individual transactions with the bank?    Witness replied that he spoke of his individual transactions only. Plaintiff's Counsel moved to rule out the evidence of Grimes, contending that a custom could not be established in that

Robinson vs. Bealle.

way.  The Court ruled out the evidence and defendant excepted.

L. GAMBRILL was introduced to prove the same facts. Plaintiff objected and the Court sustained the objection, defendant excepting.

Defendant then offered to introduce a number of witnesses to prove that A. B. Davis was in the habit of discounting notes for them and giving certificates of deposit without consulting the board of directors.   The Court refused to receive the testimony and defendant excepted.

Both parties having closed, the Court charged the Jury as follows:

1st.  It is admitted that the circulation, on the 26th of May, 1843, was $226.945.   It is also admitted that bills paid over to the assignee by J. L. Mustian, amounting to $20.500; bills in the hands of Ragan, assignee, $4.790; bills in the hands of Bailey, $4.005; bills in the hands of Bonner, $1.-500, are not to be counted in the circulation.   These bills amount to $30.795, and must be deducted from the circulation: this would leave the circulation, in round numbers, including the bills of the Columbus Bank, $196.000.   The Columbus Bank bills, to the amount of $117.000 are in dispute —these, if deducted, would leave the circulation about $80.-000.   There is a further amount of $44.000 in the hands of the assignee.   Plaintiff claims that these are a part of the bills put in suit by the Columbus Bank, and defendant says they have been redeemed by the assignee.   Now, then, as to this $44.000: possession of the bills by the assignee is *prima facie* evidence that they have been redeemed by him; and if so, they ought not to be counted in the circulation; but this *prima facie* evidence that they have been redeemed, raised by possession of the assignee, may be rebutted by proof.   Mr. Dougherty introduced Cooper and Williams to prove that these are a part of the same bills that were contained in the packages delivered to Edward Carey.   In this manner he proposes to rebut the *prima facie* evidence of redemption raised by the possession of the assignee; and I charge you

that if you believe that the $44.000 in the hands of the as-
signee did belong to the Columbus Bank and constituted a
part of the bills sued on by Holt & Alexander, and that these
are the same bills now in the hands of the assignee, then the
*prima facie* evidence, by possession of the assignee, is rebut-
ted, and the $44.000 should be counted in the circulation.

2d. The Court further charged: Defendant says the plain-
tiff's bills are paid off in this: that Smith, and Matheson, and
Banks have paid off plaintiff's bills; well, if the proof shows
that in these compromises the bills have been paid off, then
you must find for defendant.   To make these compromises a
settlement in full, it devolved upon defendant to show the
amounts paid by Banks, Smith and Matheson and the amount
of the judgments or claims settled.   Without these *data* you
cannot determine the proportion received by bills of plaintiff.

3d. The Court further charged: Defendant insists that
the bills held by the Columbus Bank should not be counted
in the circulation, because the Planters' & Mechanics' Bank
organized on a specie certificate for $250.000 instead of
$250.000 in specie, and that this certificate was made by the
Bank of Columbus to enable the Planters' & Mechanics'
Bank to effect an illegal organization.   Well, if this arrange-
ment was made with the Bank of Columbus—mark the word
—with the Bank of Columbus, then the Columbus Bank bills
constitute no part of the circulation.   Mr. Dougherty insists
that this act was the act of A. B. Davis, cashier, and not the
act of the Bank of Columbus.   If you believe that this was
the act of A. B. Davis, cashier, it devolves on defendant to
show that he was authorized by the Bank of Columbus, at
the time, or that the bank afterwards assented to it; for al-
though, by implication of law, the cashier had authority to
give the certificate of deposit, and that certificate would bind
the Bank of Columbus, this power to A. B. Davis, cashier,
did not authorize him to enter into an illegal act with the
Planters' and Mechanics' Bank, in fraud of the law; and
this act of Davis, in collusion with the committee of the
Planters' & Mechanics' Bank, does not affect the claim of

Robinson *vs.* Bealle.

the Bank of Columbus. Now whether this was the act of the bank or the act of A. B. Davis, is a question of fact for you to determine on the proof.

4th. The Court charged further, that if the Jury believed that William Dougherty, acting for himself, made an arrangement with H. S. Smith by which he agreed not to prosecute any further suits against said Smith, and to dismiss those already pending, and that he did dismiss those suits so pending; and if they further believed, that this was a personal matter between Dougherty and Smith, it would not operate as a release of his stock. Defendant must go further, and show that Dougherty, as Attorney and by authority of his clients, and acting for them, did release Smith as a stockholder, and this authority may be implied from circumstances. In this latter event Smith's stock would be discharged from liability to the amount of the claims held by the parties releasing him, and such release may be pleaded by any person holding stock directly or indirectly through Smith.

5th. The Court charged further, as follows: The whole amount of circulation, as admitted, is $226.945.

| Take from this Mustian's bills, | $20.005 | |
| Bailey's " | 4.005 | |
| Bonner's " | 1.500 | |
| Ragan's " | 4.790 | |
| | | $30.795 |

Add bills of Bank of Columbus, $117.000—take this from $226.945. This leaves $79.150. But suppose you are of the opinion that the bills of the Bank of Columbus constitute a part of the circulation, then the amount of outstanding circulation is $196.000. This you will work out by the Rule of Three, thus: 10.000 | 196.000 ⋈ 100, which, on 100 shares, gives a liability of $1960. Then, if you find that Robinson has redeemed $1530, or any other amount, you will deduct that and find your verdict for the balance. If you find the Columbus Bank circulation is to be taken out, you work the sum in the same way, changing your second figure to $80.000.

If you find he is liable on 575 shares instead of 100, then change your third figure to 575.

Defendant excepted to each and all of these charges of the Court.

Defendant then requested the Court to make the following charges:

1st. To make certificates of deposit, is within the scope of a cashier's authority; he is a general agent in a particular branch of the bank's business, and third parties are not affected by restrictions placed upon his power when acting within the scope of his authority, unless such restriction is brought to the notice of such third party.

2d. That no person can derive a benefit from his own fraud; neither can he derive a benefit from the fraud of his agent, though, in fact, he knew not of the agent's fraud; for from motives of public policy, the law presumes knowledge and makes the knowledge of the agent the knowledge of the principal.

3d. If the cashier of the bank issued a certificate acknowledging that $230.000 in specie had been deposited in the Bank of Columbus, when in fact only a small amount of specie had been deposited, and the remainder was in bank notes and individual notes indorsed to the satisfaction of the bank, and the Planters' and Mechanics' Bank organized upon said certificate, such organization was illegal. The Columbus Bank was *particeps criminis*, and bills held by it must be rejected from the aggregate circulation.

4th. If the Bank of Columbus issued a specie certificate of deposit, and delivered the same to the committee of the Planters' & Mechanics' Bank to organize under its charter, and the latter bank did so organize by virtue of said certificate, such organization is illegal and the Bank of Columbus cannot derive advantage under such illegal organization, so as to recover as a bill holder against the stockholders; and it makes no difference whether said certificate was issued by the bank itself or by its cashier, or that the cashier failed to communicate to the bank the purposes for which it was is-

Robinson *vs.* Bealle.

sued. The issuing of the certificate within the scope of his authority, makes all facts communicated to the cashier in the course of that transaction, to be considered by you as communicated to the bank.

5th. If the Jury believe that John Banks' *pro rata* liability on 200 shares of stock was $2000, and the plaintiff, for a valuable consideration, has released him from his *pro rata* liability on said stock, such release will prevent the plaintiff from recovering anything from defendant, on any portion of such stock transferred to him directly or indirectly, by John Banks, even though plaintiff's claim is $500 and he received from John Banks but $100, or it is not in proof how much plaintiff received.

6th. In determining the aggregate circulation, you will take first the amount of bills in circulation when the bank ceased doing business. You will deduct therefrom any bills that come within any of the conditions already stated; and also all bills which were not put in judgment or sued upon within six years from the time the bank ceased to do business, or upon which a new promise to pay has not been proven within six years prior to commencement of plaintiff's action, for the law presumes all such bills to have been paid from lapse of time.

7th. If the cashier of a specie paying bank issue a certificate of deposit payable in specie, or a specie certificate to a person who has a credit with the bank, for the amount of the certificate, whether the credit arise from notes discounted or money actually deposited, it is within the scope of his authority and the knowledge of the cashier, that such certificate is to be used for organizing a bank on a specie basis, is the knowledge of the bank. The knowledge of the cashier, that the specie is not to be drawn by the holder, but is only temporarily held for a certain purpose, is the knowledge of the bank; in fact, everything communicated to the cashier, while acting within the scope of his authority, is the knowledge of the bank—as much so as if the communication had

been directly to the bank; otherwise, principals could commit fraud through their agents, without responsibility.

8th. A bank is responsible for the frauds of its cashier when he is acting within the scope of his authority; and if the cashier give a certificate of deposit, knowing that it is to be used for a fraudulent purpose when he gives it, the knowledge of the cashier is the knowledge of the bank.

9th. That by the charter of the Planters' & Mechanics' Bank, the bank, itself, and the directors are principal debtors, and the stockholders are only secondarily liable.

10th. If the Jury believe, from the evidence, that the directors made an excessive issue over the amount allowed by the charter of the bank, they became individually liable, primarily and concurrent with the bank, for the payment of the excess.

11th. If the Jury believe that H. S. Smith and John Banks were directors at the time the excessive issue took place, that a discharge of said Smith and Banks, or either of them, by the plaintiff or his Attorney, is a discharge of all the stockholders to whom they, or either of them, transferred any stock, so far as regards the plaintiff.

12th. That the liability of the directors is a joint liability among themselves; and that a discharge of any of them by any bill holder, is a discharge of the rest of the directors, so far as that bill holder is concerned.

13th. If the Jury believe that more than four years elapsed between the accrual of plaintiff's cause of action and the commencement of this suit, then it is barred by the Statute of Limitations.

14th. If the Jury believe, from the evidence, that more than six years elapsed between the accrual of plaintiff's cause of action and the commencement of this suit, it is barred by the Statute of Limitations.

15th. If the Jury believe that more than four years have elapsed between the Sheriff's return of *nulla bona* on the *fi. fa.* in favor of plaintiff, against the Planters' & Mechanics'

Bank, and the commencement of this suit, then it is barred by the Statute.

16th. If the Jury believe that more than six years have elapsed between the return of *nulla bona* on plaintiff's *fi. fa.* against the Planters' & Mechanics' Bank and the commencement of this suit, then it is barred.

17th. If the Jury believe that more than four years elapsed between the deed of assignment by the bank to Alexander, or between its recognition by the Act of 1843 and the commencement of this action, then it is barred by the Statute.

18th. If the Jury believe that more than six years elapsed between the deed of the bank to Alexander, or between its recognition by the Act of 1843, and the commencement of this action, then it is barred.

19th. If the Jury believe plaintiff's action is "founded on notes," (bank bills,) and more than six years elapsed between their date and the commencement of this suit, then it is barred.

20th. That an action of debt is barred in four years.

21st. That an action of debt is barred in six years.

.22d. If the Jury believe that more than four years elapsed between the failure of the bank to pay its bills in specie and the commencement of this action, then it is barred.

23d. If the Jury believe that more than six years elapsed between the failure of the bank to pay its bills in specie and the commencement of this action, then it is barred.

24th. If it appears from the transfer book that H. S. Smith and A. B. Ragan, both or either, were not the owners of the number of shares of stock transferred to defendant on the day when said transfer was made, then the transfer to defendant did not make him a stockholder. The Court refused to give this request, but charged, that if A transfer stock to B, on the transfer book of the bank, the transfer book is evidence, not only that B is a stockholder, but also that A is a stockholder. To this charge defendant excepted.

25th. Defendant further requested the Court to charge, that if, after proceedings for forfeiture, in consequence of a

failure to redeem their bills in specie, were instituted against the Columbus Bank, or the Planters' & Mechanics' Bank, the Planters' & Mechanics' Bank and the Bank of Columbus, by their proper officers, had a meeting and determined to borrow on the individual notes of directors from other banks $100.000 each as a basis for issuing bills; and failing to do this, the Columbus Bank had determined to refuse, at its counter, the bills of the Planters' & Mechanics' Bank; and afterwards agreed to receive, and did receive the bills of said bank on the security of a bond given, or promised to be given, by the directors of said Planters' & Mechanics' Bank, such an agreement was illegal; against the spirit of their charters, in contravention of public policy by giving false credit to the bills; and the bank of Columbus, under such circumstances, would not be entitled to recover of the stockholders under the 11th section of the charter, as that section intends to protect *bona fide* holders, and no others. The Court gave this request, with the following qualification: "But I further charge you, that if the Bank of Columbus had *determined* to refuse taking the bills of the Planters' & Mechanics' Bank, at its counter, afterwards agreed to receive, and did receive such bills, on the making of a bond by the directors of the Planters' & Mechanics' Bank to secure the payment of the same, that the taking of said bond was not an illegal act; and the Bank of Columbus would, under such circumstances, be *bona fide* bill holders, and entitled to recover under the 11th section of the charter. Defendant's Counsel excepted to the qualification added by the Court.

The Court refused to give any of the requests made by defendant's Counsel in charge to the Jury, except the last, and gave that with the qualification stated.

Defendant's Counsel assign as error the several rulings of the Court, in regard to the evidence, and the several charges of the Court and refusals to charge.

R. J. MOSES and HINES HOLT, for plaintiff in error.

WILLIAM DOUGHERTY, for defendant-in error.

Robinson *vs.* Bealle.

*By the Court.*—BENNING, J. delivering the opinion.

The first and second exceptions and the exception to the refusal to charge the plaintiff's twenty-fourth request, may be taken together. They all relate to the admission of the transfer book as evidence.

On this transfer book there appeared a transfer of a certain number of shares, made by Robinson, the plaintiff in error. This act of his implied an admission by him, that he owned that number of shares. And it is generally true that an admission is good as evidence against the person who makes it.

Why, then, is it not true that this admission was good as evidence against Robinson? Because, it is said, that there was better evidence of the thing admitted. The best evidence of the title to stock, it is said, consists in the stock certificate-book, the stock ledger and the stock transfer book taken together.

But, there is nothing in the bill of exceptions to show that any of these books, except the transfer book, exists, or ever existed; and, of course, there is nothing in it to show what were the contents of any of those books, except the transfer book, if any but that exists.

But if all these books existed, what law is there that says that they shall be better evidence that a person owns stock than his admission that he does? We know of none.

[1.] We think that the Court was right in letting the book go to the Jury as evidence.

The book having been let in, Robinson moved to rule it out, because, as he said and offered to prove, the persons who had transferred stock to him, had previously transferred to other persons more stock than all that, according to the book, they owned; and because, as he insisted, the book showed the existence of higher evidence of his ownership of the stock, if he was owner of stock, than his admission that he was owner.

Were these reasons a sufficient foundation for the motion? The latter of them has been considered and found not to be so.

As to the former, the virtue of it, if it had any virtue, was not such as was efficacious for taking the book away from the Jury, but only for countervailing the book in the hands of the Jury. If what Robinson offered to prove went to show that he was not owner of stock, his own admission went to prove that he was.

But this reason was one that could have had no virtue in it for any purpose, unless the law was such that a man could own no stock except what the transfer book showed him to own. The law, however, was not such. Stock, of necessity, was owned before there was a transfer book. Property must exist before the transfer of property can exist. These persons might have been original subscribers for stock.

It being proper, then, that the book should not be ruled out, was what Robinson requested to be charged concerning the book proper? Certainly not, for the reasons already given.

Was what was charged proper? A part of it was. A transfer of stock by A to B is, according to the view just taken, evidence against A that he owns the stock. So much of the charge as charged this was proper. And this, perhaps, is as much of the charge as the facts to which the charge particularly referred called for. The rest of the charge involves an important question, and one which was very little argued before us. We, therefore, do not decide it.

This disposes of the three exceptions first mentioned.

Carey, as assignee of the Bank of Columbus, gave to Chambers a discharge from all his liability, whether as a stockholder or as a director in the Planters' and Mechanics' Bank of Columbus, to Carey, as assignee of the former bank. Robinson, the plaintiff in error, offered this discharge as evidence. The Court would not receive it. This constitutes the next exception.

The plaintiff in error does not insist that the discharge, so far as it was a discharge of Chambers' stockholder liability, was admissible. He contends, however, that it was admissible, so far as it was a discharge of his *director* liability.

His argument is, that the bills of the Planters' and Mechanics' Bank of Columbus, held by Carey as assignee of the Bank of Columbus, made debts that were created in violation of the fourth part of the sixth section of the charter; that if the stockholders are made to take up such bills, the stockholders can then collect the bills from the directors, and therefore, that if the holder of such bills releases the directors from their liability to pay the bills, he, in effect, also releases the stockholders.

Is this a good argument? The first proposition involves merely a question of fact.

The second depends, for its truth, on the said fourth part of the sixth section of the charter. That part is in these words: "The total amount of debts which the said corporation shall at any time owe, whether by bond, bill, note or other security, shall not exceed three times the amount of their capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safekeeping. In case of excess, the directors under whose administration it shall happen, shall be liable for the same in their private and individual capacities, and may be sued for the same in any Court of record in the United States, by any creditor of the corporation, any condition, covenant or agreement to the contrary notwithstanding; but it shall not be so construed as to exempt the said corporation, or the lands, tenements, goods and chattels of the same from being liable for and chargeable with the said excess."

The directors are to be subject to suit "by *any creditor* of the corporation."

When a stockholder redeems the bills of the corporation, he becomes the "creditor" of the corporation.

Therefore, the directors are subject to suit by such a stockholder.

This conclusion seemed to be to the Court a necessary one.

If it is a necessary one, then, by familiar law, a release of the directors would be a release of the stockholders.

[2.] The Court, therefore, considering the argument a

good one, think the discharge given to the director, Chambers, admissible as evidence.

This was the conclusion the Court came to when it made its decision.

I must say, however, that on further reflection, I am not satisfied that this is a necessary conclusion.

Suppose this case : The bank gives, say, $20.000, in its bills, for $20.000 in specie.   The $20.000 in bills make, against the bank, a debt that is in "excess" of this debt limit prescribed by the charter.   The $20.000 in specie is applied, not to the uses of the directors, but to the uses of the bank, say in paying a dividend to the stockholder.   Afterwards, the $20.000 in bills come back to the bank for payment, but the bank having become insolvent, they are not paid by it.   In the end, they are taken up by the stockholders, and the stockholders then present them for payment to the directors, as bills issued in " excess" of the charter limit. The directors say to the stockholders, " These bills were given in exchange for specie.   The bank, not we, got the specie, and you got the specie from the bank, paying nothing for it. If you require us to pay you these bills, you must pay us back that specie.   You cannot have the specie and the bills both.   You cannot, at one and the same time, stand on both sides of the contract."

Now I must say that I do not perceive what answer the stockholders could make to this; and therefore, that I am not at all satisfied with the conclusion aforesaid, to which the Court came.

But assuming the conclusion to be true, the decision of the Court was manifestly right ; for the other proposition necessary to the decision, viz : that the release of a party responsible over to another party is a release of that party also, is not disputable.

Disposing of this exception, is disposing of the exception to the refusal of the Court to give in charge to the Jury the 10th and 11th requests of the plaintiff in error.

The refusal to give the twelfth request may be best disposed of here.

That was a request to charge, that the liability of the directors of the Planters' & Mechanics' Bank of Columbus, under the part of the charter aforesaid, is a joint one, and that a discharge of any director by a bill holder, is, as to that bill holder, a discharge of all the directors.

This request contains two propositions.   Of these, the last may be treated as disposed of by what has been said on the exception to the judgment excluding Chambers' discharge ; for that the release of one of two or more joint debtors, is a release of the others, is too well settled to admit of being dwelt on.

[3.] The first seems to us to result necessarily from the language aforesaid of the charter.   That language is—"In case of excess, the directors under whose administration it shall happen, shall be liable for the same," &c.

The next exception was one to the refusal of the Court to permit John Banks to be asked whether he had not paid out certain bills on the bank, for a plantation in Stewart County. This exception was very little argued, and it is too important a one to be decided without argument, unless a decision of it were indispensable.   We therefore do not decide it.

The next was an exception to the refusal of the Court to receive as evidence 59 " suits," they being suits in favor of various bill holders against various stockholders, other than H. S. Smith and John Banks, and suits in which Wm. Dougherty was plaintiff's Attorney.

The issue was such, that it was material to know whether the bills on which these suits were founded, made a part of the bills to the redemption of which the stockholders were liable.

It was not insisted, that if Smith had been released from those bills they would make a part of the bills, to the redemption of which the stockholders were liable.   Smith had, at one time or another, held stock enough to make the amount

of bills, to the ultimate redemption of which he was liable, exceed the amount of all those on which the fifty-nine suits were founded.

And whether Smith had been released from them or not, depended on the import of an affair to which Smith and Dougherty were parties.

The question whether that affair amounted to a release of Smith or not, was left by the Court to the Jury to be determined by them on the evidence. (See fourth charge.)

Suppose the Jury had determined that it amounted to a release? Then, the next question for them would have been, what bills they were from which the release freed Smith? And, to determine that question, the "suits"—the declarations, were evidence almost indispensable; for the bills from which the release freed Smith, were the bills on which those suits were founded.

The suits were, therefore, as we think, admissible in evidence.

A. B. Davis was the cashier of the Bank of Columbus, and as such, he issued a "specie certificate" to certain persons, when those persons had no specie on deposit in that bank. It was a question in the case, how far this act of Davis bound or affected the bank.

The answer to that question depended, of course, upon the extent of his authority to bind the bank. Any evidence, therefore, going to show the extent of his authority to bind the bank, would have been pertinent to the question.

A witness, Fontaine, was asked whether the cashier, Davis, had authority from the bank to give specie certificates, unless the specie had been deposited. The question was objected to, and the Court over-ruled the objection. Ought the Court to have over-ruled the objection?

[4.] We think that the Court ought. The question was directly pertinent to the issue in hand. Suppose Fontaine had answered yes, that the cashier *had* express power to issue such certificates; would not that answer have been pertinent? He answered, no. But can the pertinency of a

question depend on whether it shall be answered yes or no? I do not mean to say that the answer, if no, would not have been pertinent; but merely, that if yes, its pertinency would have been more apparent.

It is no doubt true, that the question of the extent of an agent's power, is a question of law as well as of fact. But, then, the law can only answer its part of the question properly, when it has before it the facts in their whole array. And what is the positive or express grant of power to the agent, is certainly one of those facts.

The assignee of the Planters' & Mechanics' Bank of Columbus had in his hands some $44.000 in bills of that bank. The assignee of the Bank of Columbus held a judgment against the former bank, to the amount of more than $100.000, founded on the bills of that bank. It became a question, whether the $44.000 in bills held by the assignee of the former bank were not a part of the bills on which the judgment was founded. That assignee resided in the county. These things being so, the defendant in error exhibited a paper to a witness, and asked him whether the paper did not contain a true copy of the bills set forth in the declaration, belonging to the case in which the judgments aforesaid had been obtained. The question was objected to, but allowed by the Court. Ought it to have been allowed?

[5.] We think not. The question for the Jury was, whether the bills fitted the declaration. On that question, the bills, themselves, would have been better evidence than any man's recollection of them, or any man's copy or note of them. This must be manifest.

That there was a question on the extent of the power of A. B. Davis, as cashier, has already been stated—stated in connection with the exception to Fontaine's testimony. On this question, the plaintiff in error offered evidence of a number of acts done by Davis, as cashier: as, that Davis, without consulting the board of directors, authorized a person to check for cotton purchases, and if the person was "short" $8.000 on $10.000, permitted him to settle the amount by "a

local note"; that Davis, without consulting the directors, was in the habit of discounting notes for a number of persons, and of giving them certificates of deposit. This evidence was repelled by the Court. Ought it to have been received?

[6.] We think it ought to have been. The acts of which the evidence was offered were all of the same general nature, and they were numerous. It is, therefore, to be presumed, that the bank had given Davis authority to do them, and to do similar acts with other persons. And the question was, whether Davis had authority to do such acts? (*Story Ag.* §§87, 127, 114; *Ph. Ev. Cow. & Hill's Notes, note* 187.)

The charge of the Court was in five divisions.

A part of the first division was as follows: "I charge you that if you believe that the $44.000 in the hands of the assignee did belong to the Columbus Bank, and constituted a part of the bills sued on by Holt and Alexander, and that these are the same bills now in the hands of the assignee, then the *prima facie* evidence, by possession of the assignee, is rebutted, and the $44.000 should be counted in the circulation." This is the only part of this division of the charge complained of before us.

Doubtless this is true, in ordinary cases. If A, having a note on B and B only, gets the note into judgment against B, the note becoming merged in the judgment, becomes useless to A. And A may give it up with impunity to B. In such a case, that the note happens to be found in the possession of B, does not, therefore, authorize the inference, that the note, or rather the judgment, has been paid to A.

But suppose the note to be also on C, as well as B; C, as surety for B. In that case, the note, as to C, is not merged in the judgment. The note, therefore, is still useful to A; and it remains useful to him as long as the judgment remains unpaid. But as soon as the judgment is paid, the note ceases to be useful to him, and he has no longer any reason for withholding the note from B. Indeed, he cannot, after payment of the judgment by B, withhold the note from B. B is entitled to the possession of the note for his peace's sake,

if not for his defence against possible suits that may be conceived of, brought by the surety.

In such a case as this, it may admit of a grave doubt, whether the fact that the note was in judgment against B, would, of itself, sufficiently account for B's possession of the note.

And the present is just such a case. These notes were notes that bound the bank and bound the stockholders—the former, primarily; the latter, ultimately. The judgment was against the bank only.

We think, therefore, that this is what the Court should have told the Jury, viz: that it was a question for them, whether the fact that the bank bills were some of those on which the judgment was founded, had more weight to show the bills, or rather so much of the judgment, unpaid, than the fact that the bills were in the possession of the maker or its representative, had weight to show the bills paid. We think the question was a question on the weight of evidence.

In the second division of the charge, there are to be found these words: "To make these compromises a settlement in full, it devolved upon defendant to show the amounts paid by Banks, Smith and Mattheson, and the amount of the judgments or claims settled. Without these *data*, you cannot determine the proportion received by bills of plaintiff." What the plaintiff complains of are the words: "It devolved on defendant to show the amounts paid by Banks, Smith and Mattheson."

[7.] And we think the words are exceptionable. No rule of proportion for finding the liability of the stockholders in this or any other bank, has as yet been suggested that would make the amounts paid, in such compromises as the charge refers to, one of the terms of the proportion.

It seems that Carey, as assignee of the Bank of Columbus, was the holder of bills on the Planters' & Mechanics' Bank of Columbus to a large amount; and that it became a question, on the trial of the case, whether those bills were bills, to the ultimate redemption of which the stockholders in the

Planters' and Mechanics' Bank were liable. That question arose thus.

The second section of the charter of the Planters' & Mechanics' Bank contains these words: "The stock of the company shall consist of one million of dollars, in shares of one hundred dollars each; and the stockholders in said bank are hereby required to pay twenty-five per cent. on the amount of their capital stock in specie, before the board of directors shall be permitted to issue their bank notes."

It appears from the evidence, that in February or March, 1837, when the stockholders of this bank assembled for the purpose of organizing the bank and setting it in motion, they made payments to the bank of twenty-five per cent. on their stock; payments consisting almost entirely in the notes of the stockholders themselves, only a small part being in specie and another small part in the notes of other banks; that the specie, the bank notes and the stockholder notes were turned over to a committee of the stockholders instructed to make an arrangement with A. B. Davis, cashier of the Bank of Columbus, for obtaining specie; that this committee did make an arrangement with Davis as such cashier for obtaining specie, namely, this arrangement: that he was to receive from the committee the bank notes and the stockholders notes aforesaid, and in exchange for them was to give the committee a specie certificate of deposit on the Bank of Columbus for some $250.000, with the understanding that specie was not to be demanded on it; that this arrangement was carried out, the certificate made, delivered to the committee and delivered by the committee to the stockholders; that the object of the arrangement was to make the certificate itself stand for so much actual specie in the organization of the Planters' and Mechanics' Bank; and therefore to enable the bank to evade the aforesaid charter provision that this object was accomplished and the bank organized upon the certificate, as if it had been so much specie; and that some time afterwards the bank commenced issuing bills. That soon after the organization of the bank, the stockholders borrowed from it nearly as much as

Robinson *vs.* Bealle.

the amount of the certificates and were paid in checks on the Bank of Columbus; that on none of these checks except one, was specie demanded of that bank; that on that one payment specie was refused and Central Bank bills had to be taken as a compromise; that at the time when the certificate was given, specie was at a premium of from 5 to 8 per cent. and that no premium was paid on the certificate; and that "specie was getting scarce every day after the organization in '37."

Did the directors of the Bank of Columbus know of this transaction at the time when it happened, or within any short time afterwards? If they did not, it must have been because they failed to use ordinary care in the discharge of their duties as directors. The transaction was such, that the books of the bank must have contained some entry relating to it—some entry as to the certificate or as to the debt against the bank created by the certificate; and any such entry would, of itself, have been the beginning of a clue that, followed up by the directors, would have led them on to every part of the transaction. If the directors, on seeing such an entry, had inquired of Davis what it meant, he would, it is probable, have put them in possession of all the facts of the affair. Why should he not have done so? The affair was one, not for his private benefit, but one exclusively for the benefit of the bank. It was an affair which relieved the bank from exposure to the risk of having its specie drawn from it to the amount of $250.000, at a time when specie was at a premium of 5 to 8 per cent. and when specie was every day growing scarce. Is there any falsehood which he could have told that would have proved as agreeable to the directors as would the naked truth? Besides, what falsehood is there to be imagined that would not have met with instant detection? The $250.000 in specie were not in the vaults of the bank; that was a fact of which any of the other bank officers could have told them—a fact of which, indeed, their own eyes must have told them.

Now the duties of the directors were such as to require of them that they should be familiar with the contents of the

books of the bank.   A provision of the charter was as fol-
lows : " The total amount of the debts which the said corpo-
ration shall at any time owe, whether by bond, bill, note or
other contracts, shall not exceed three times the amount of
their capital stock actually paid in, over and above the
amount of specie actually deposited in their vaults for safe-
keeping.   In case of excess, the directors under whose ad-
ministration it shall happen, shall be liable for the same in
their individual, natural and private capacities."    Under this
provision, it could not but have been the highest duty of the
directors, not less on their own account than on that of the
bank, to keep themselves acquainted with the books of the
bank ; and when they should see on those books, at any
time, a single entry adding $250.000 to the debts of the
bank, to investigate that entry, and especially to ascertain
the quantity of specie then actually deposited in their vaults
for safekeeping.

If, then, this affair was not, in act and object, known to
the directors at or about the time when it happened, the
reason must have been, a want of ordinary attention in the
directors to their duties.

But it is to be presumed that the directors did their duty ;
and therefore, that they knew of the affair.

This being so, did the directors take occasion to repudiate
the affair, or to condemn it, or to censure the cashier, or,
most important of all, to advertise the public of the affair ?
Not at all.   Whatever of profit to the bank there was in the
arrangement, they silently acquiesced in the bank's receiving.
Whatever of danger to the public, they silently suffered the
public to be exposed to.   They allowed the bank to receive
the bills of the other bank as though these bills had not been
issued in violation of its charter.

Indeed, it is not too much, perhaps, to say that they had
expressly authorized Davis to make the arrangement, if they
could, by any *general* grant of power, authorize any one to
make such an arrangement.   They had, as long before as
1833, passed this resolution: " *Resolved*, that A. B. Davis,

cashier of this bank, have discretionary power to make such. arrangements as he may conceive beneficial to the bank, when any emergency arises. and the board is not in session." Of necessity, this included the grant of authority to Davis, to determine what might be "an emergency." This, therefore, was an express grant of authority to Davis to make the arrangement in question, provided the arrangement. was one that, in his conception, would be "beneficial to the bank," and an "emergency" had, in his judgment, arisen, calling for the arrangement. Is it likely that he thought that an emergency had arisen calling for the arrangement? Suppose the board of directors had demanded of him his authority for making the arrangement, is it likely that he would have referred to this resolution, and would have declared that, in his conception, an emergency had arisen that called for the arrangement as the one most beneficial to the bank that could have been made—an emergency by which the bank stood exposed to the danger of having specie drafts made upon it to the amount of $250.000 by the stockholders of the new bank, to enable them to comply with their charter and organize that bank? Can there be a doubt that he would? If he would, then the resolution was an express authority to him to enter into the arrangement.

Now if this resolution was an authority to Davis to make the arrangement, then the arrangement became the act of the directors.

And the arrangement equally became the act of the directors, if they knew of the arrangement, or might have known of it, but for their own gross neglect of their duties; and instead of repudiating it, or exposing it to the public, silently suffered the bank to be gainer by it and the public to be loser.

If the *tort* of an inferior agent is one, the bad effects of which it is in the power of the superior agent to neutralize by some act of his, and he fails to do that act, he cannot excuse himself by saying that his failure to do the act was be-

cause he had not known of the *tort*, provided the act was one,. to the knowledge of which, bestowing ordinary attention on: his duties of supervision,. would have led him, and he, from: mere neglect, did not bestow as much as ordinary attention on those duties. In such a case, the act of the inferior agent becomes the act of the superior agent.

And in this case, if the directors had repudiated the arrangement of Davis, or had exposed it to the public, and had refused to receive the bills of the Planters' & Mechanics' Bank, issued on the basis of the arrangement, the bad effects of the arrangement would have been neutralized. . And they either knew of the arrangement, or if they did not, it must have been because they failed to give ordinary attention to their duties of supervision over the affairs of the bank..

This being so, the arrangement of the cashier became the act of the directors; and that even if the aforesaid authority, giving resolution of the directors be left out of the question,. is it to be said, that as the arrangement made by the cashier was illegal, it was one which, to be the act of the directors, had to be *expressly* authorized or *expressly* ratified by them?

But it does not follow, that because the act of an inferior agent is illegal, it cannot become the act of the superior agent, unless it has been *expressly* authorized or *expressly* ratified by him.

Any act of negligence in the Deputy Sheriff, is an act of negligence in the Sheriff; any act of negligence in the mate of a vessel, or in any other inferior officer, or in any seaman, is the act of the master. Yet, in neither case need there be any express authorization or ratification of the acts, respectively, by the Sheriff or the master.

And this Court has held, that the bills of the Planters' & Mechanics' Bank issued under this very arrangement, and therefore, issued in violation of the charter of the bank, bound not only the directors of the bank, but also the *stockholders*. And yet, the arrangement was one as to which it is not pretended that it was *expressly* authorized, or *expressly* ratified

by the stockholders. (18 *Ga. McDougald vs. Bellamy ; Mc-Dougald vs. Lane ; Banks vs. Darden.*)

And if the fact that the Act is *illegal,* is sufficient to prevent the act from becoming the act of the superior, unless it be expressly authorized or expressly ratified by him, the fact must be equally sufficient to prevent the act from becoming his act, even if it be expressly authorized or expressly ratified by him ; for the *express* authorization or ratification of an illegal act, must be just as illegal and just as void as any *implied* authorization or ratification of the illegal act could be. And therefore, to say that an illegal act of the inferior, cannot be the act of the superior, unless the superior · expressly authorize or expressly ratify it, is to say that an illegal act of the inferior cannot become the act of the superior at all.

Assuming, then, the conclusion to be true, that this arrangement of Davis, the cashier, was the arrangements of the directors, the question becomes this : Was it the arrangement of the *bank*—the act of the *bank ?*

Why was it not ? Because it was an *illegal* arrangement ? Now if it were true that no illegal act of the directors of a bank, who are its highest officers, could become the act of the bank, it would be more true that no illegal act of any lower officer of the bank could become the act of the bank ; and therefore, it would be true that no illegal act of any officer of the bank could become the act of the bank. And if this were true, then it would be true that no illegal act whatever could possibly be the act of the bank, for the bank is a corporation ; and therefore, all its acts have to be acts done by agents ; and consequently, if no illegal act of any of its agents could be the act of the bank, no illegal act at all could be the act of the bank.

Now it has been said of the king, that the king can do no wrong ; but this has never been said of any other corporation ; and although it has been said of the king, it has not always been sufficient to save the king's head. On the contrary, it has been said, and been decided often, that other

corporations may be guilty of *torts*—*torts* for which they may be sued in case, trover or trespass—may be guilty of the misuse or the non-use of their franchises, for which they may have to incur a forfeiture of those franchises, or even of their corporate existence. But such *torts*, such misuse or non-use of their franchises, must consist of illegal acts or illegal omissions. And all illegal acts or illegal omissions in the case of a corporation, must be the acts or omissions of some agent of the corporation; for a corporation can act or forbear to act, only by agent; therefore, that an act of an agent or officer of a corporation is illegal, does not necessarily prove that the act is not the act of the corporation. In a word, there may be acts of the directors of an incorporated bank, that will be the acts of the bank, although the acts are illegal.

Which, then, of the illegal acts of the directors of a bank, are those that are the acts of the bank? At least the following, I take it, viz : those as to which it is the intention of the directors that they shall enure to the benefit, not of themselves but of the bank, and which do enure exclusively to the benefit of the bank, and which are such that the directors are enabled to do them, only by being in the office of directors.

Now the act in question, viz : the arrangement aforesaid of the cashier, which, as we have seen, became, in law, also the arrangement or act of the directors, was such an illegal act as this. It was an arrangement that was beneficial, not to the directors, but to the bank ; and that was so intended to be ; and it was an arrangement that could not have obtained any efficacy from becoming the arrangement or act of the persons who were the directors, if those persons had not been in the office of directors.

This, arrangement, then, is to be considered as having been the act of the *bank*.

Indeed, if I understood aright the argument of the Counsel for the defendant in error, the argument did not deny but that if this arrangement could be one made out to be the

Robinson *vs.* Bealle.

:arrangement of the *directors*, it would, as a matter of course, have to be considered the arrangement of the bank itself. The chief labor of that argument consisted in the effort to show that the illegal arrangement of the cashier, could not be considered as the arrangement of the directors, except so far merely as to render the certificate valid.

Assuming it to be true then, that this arrangement of the cashier became the act of the directors, and that the act of the directors became the act of the bank, the only question remaining is, was it one of the consequences of the arrangement to debar the bank from resorting, by suit, to the liability of the stockholders of the Planters' & Mechanics' Bank for the ultimate redemption of the bills it held on that bank. And that question has been twice decided by this Court— once in *McDougald, adm'x, vs. Bellamy, adm'x,* (18 *Ga. R.* 425,) and once in *McDougald, adm'x, vs. Lane,* (18 *do.* 456.) In each of those cases, the principle decided was, that whoever participated in the arrangement aforesaid, was debarred from the right of resorting, by suit, to the liability of the stockholders of the Planters' & Mechanics' Bank, to redeem the bills of the bank. If, therefore, that arrangement was in part the arrangement of the Bank of Columbus, then, according to these decisions, the Bank of Columbus was not entitled to sue the stockholders of the Planters' & Mechanics' Bank on the bills of the latter bank, held by the Bank of Columbus.

These decisions this Court is not asked to review and over rule; they are decisions which were made, I believe, (I did not preside in the cases in which they were made,) after full argument. They ought certainly, therefore, to stand at least until the question they decide has been re-argued, unless they are so plainly erroneous that their erroneousness may be seen without argument. And surely this much may be said of them: that if erroneous, their erroneousness does not reach that height.

Considering, then, these divisions as governing on the present point, our conclusion must be, that the assignee of

the Bank of Columbus was, by reason of the illegal arrangement aforesaid, debarred from the right of resorting to the stockholders of the Planters' & Mechanics' Bank of Columbus, for payment of the bills which he held on the latter bank.

And if this must be the conclusion on the point, the charge of the Court on the point was erroneous. That charge seems to have amounted to this: that the act of issuing the certificate by the cashier, became the act of the bank, so far as to make the certificate binding on the bank; but yet, that as the act, the purpose for which it was done considered, was an *illegal* act, it could not become the act of the bank, so far as to debar the bank from resorting, by suit, to the stockholders of the Planters' & Mechanics' Bank for payment of the bills which it held on that bank, unless the act was one that it had *specially* authorized, or *specially* ratified. That this is the import of the charge on this point, is to be gathered, I think, from what the Court gave in charge, contained in the third division of the charge, and from what the Court refused to give in charge, contained in Robinson's first four, and his seventh and eighth, requests to charge.

[8.] Instead of being this, the charge, according to the conclusions come to above, should have been, that although the act of Davis, the cashier, in participating in the arrangement, with respect to the certificate, was an illegal act; still, as it was an act done by him, not for himself or his own benefit, but for the bank and the bank's benefit, and was an act beneficial to the bank, and one which was known to its directors; or which, if unknown to them, must have had for the cause of its being unknown to them, that they were guilty of the want of ordinary attention to the duties of their office; and which act, yet, was not, by them, repudiated or exposed to the public, or in any way neutralized, it was to be considered as the act of the bank; and that, considered as the act of the bank, one of the consequences of it to the bank was, to debar the bank from resorting to the stockholders of the

Planters' & Mechanics' Bank for payment of the bills held by it on that bank.

This disposes of the third division of the charge of the Court, as well as of the first four, and the seventh and eighth requests to charge, made by the plaintiff in error.

The 13th, 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st, 22d and 23d requests of the plaintiff in error, relate exclusively to the question, what is the period of time which bars the present action? That question is also involved in the sixth request. These requests the Court rejected.

On this question, the two members of the Court presiding in the case, Judge LUMPKIN and myself, differ in opinion. Consequently, no judgment of the Court can be rendered on the question. The effect of this will no doubt be, that the judgment of the Court below will remain in force.

It may not be amiss, however, merely to state the opinions entertained by the two members of the Court, respectively.

Judge LUMPKIN'S opinion is, that the period of limitation is twenty years; and the opinion goes, I believe, upon the idea, that the cause of action is a *statutory liability*.

My opinion is, that six years is the period; and the opinion goes upon the idea, that the bank *bills* are the foundation of the suit; and that the bank bills are nothing but the promissory notes of the bank, and the stockholders of the bank as principal, and of the stockholders, as sureties; and therefore, that whatever is the period of limitation, as to the bank, the principal, is the period as to the stockholders—the sureties. And six years, I think, is the period as to the bank.

There is also a difference of opinion between Judge LUMPKIN and me, as to what is the rule or proportion for finding the liability of the stockholders in the bank? On this question our respective opinions, stated at large, may be seen in *Lane vs. Harris*, (16 *Ga. R.*) See, also, *The Darien Bank cases in* 17 *Ga. R.*

Had the Bank of Columbus the right to insist upon being guaranteed the payment of the bills of the Planters' & Mechanics' Bank of Columbus, as a condition of receiving those

bills? Most assuredly it had. Any person might have required such a guaranty. What law would requiring such a guaranty violate? None.

And as to the policy of sanctioning such a guaranty, what would probably be the effect of the giving of such a guaranty? The bills in circulation would all seek to get into the hand that held the guaranty. The effect, then, would be good as to the ordinary bill holder. And as to the stockholders, their liability would be lessened to the extent of the guaranty.

This disposes of the exception to the refusal of the Court to give in charge the twenty-fifth request of the plaintiff in error; and that exception is the last point in the case.

The result is, that a new trial is granted. The grounds upon which the grant of the new trial is put, have been indicated in the course of this opinion.